# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **TREMAYNE SCOTT** and **JOSHUA LEWIS**, <br><br> Plaintiffs, <br><br> v. <br><br> **ROB JEFFREYS**, in their official capacity as the Director of the Nebraska Department of Correctional Services, *et al.*, <br><br> Defendants. | Case No. 4:26-cv-03124 <br><br><br> **PLAINTIFFS' BRIEF IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER** |

## INTRODUCTION

Defendants are Nebraska prison officials that have imposed a punitive, sixty-day suspension of the religious practice of Plaintiffs Tremayne Scott and Joshua Lewis ("Plaintiffs") in response to a rule violation: the discovery of contraband. But Defendants do not suspect or accuse either Plaintiff of being involved with the rule violation. Nevertheless, Defendants decided to respond by punishing every individual at Nebraska State Penitentiary ("NSP") that practices the Native American faith, including Plaintiffs. Plaintiffs have lost access to their religious exercise due to no fault of their own. Defendants have violated and continue to violate Plaintiffs' rights under the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the federal Religious Land Use and Institutionalized Persons Act (42 U.S.C. § 2000cc *et seq*.), and Nebraska's First Freedom Act (Neb. Rev. Stat. § 20-701 *et seq*.).

This action is to restore Plaintiffs' religious exercise rights. Plaintiffs ask this Court to enter emergency equitable relief that would reinstate their access to their religious practice. The religious suspension has been in effect since February 26, 2026, and it will continue to be in effect until April 27, 2026. As soon as Plaintiffs learned of their suspension, they sought relief through the NDCS administrative grievance process, but

1

they remain without relief and continue to suffer irreparable harm. So, Plaintiffs must turn to this Court to pray for immediate emergency relief that would reinstate their access to their religious exercise.

At the time of the filing of the corresponding Emergency Motion for Temporary Restraining Order, Plaintiffs have been denied access to their religious exercise for over seven weeks, and Plaintiffs will continue to have their religious exercise rights violated while the suspension remains in place. Plaintiffs will continue to suffer irreparable harm unless this Court swiftly enters emergency equitable relief that reinstates Plaintiffs to their position before Defendants' unlawful actions and maintains the status quo pending full adjudication of Defendants' actions on the merits.

## **BACKGROUND**

Plaintiffs are Native American Nebraskans that are incarcerated at Nebraska State Penitentiary ("NSP"). Scott Aff. ¶¶ 2, 5; Lewis Aff. ¶¶ 2, 5. As part of their Indigenous heritage, Plaintiffs' religious beliefs include praying to the Great Spirit. Scott Aff. ¶ 3; Lewis Aff. ¶ 3. Plaintiff Scott's ("Scott") religious practice requires participation in the sweat lodge ceremony, including the practices of smudging with sage, cedar, and sweetgrass, and smoking red willow bark in connection with prayer. Scott Aff. ¶¶ 3, 8. Scott has practiced his faith this way since he was eight years old. *Id.* at ¶ 4. Scott has regularly practiced his faith in accordance with his religious beliefs while incarcerated at NSP. *Id.* at ¶ 7. Defendants suspended Scott's access to the core components of his religious exercise on February 26, 2026, and he has not been permitted to practice his faith according to the demands of his beliefs since that day. *Id.* at ¶¶ 9–16, 29.

Plaintiff Lewis's ("Lewis") religious practice also requires participation in the sweat lodge ceremony, and it also includes the practices of smudging with sage, cedar, and sweetgrass, and smoking red willow bark in connection with prayer. Lewis Aff. ¶¶ 3, 8. Lewis has practiced his faith this way since 2013. *Id.* at ¶ 4. Lewis regularly practiced his faith in accordance with his religious beliefs while incarcerated at NSP. *Id.* at ¶ 7. Defendants suspended Lewis's access to the core

2

components of his religious exercise on February 26, 2026, and he has not been permitted to practice his faith according to the demands of his beliefs since that day. *Id*. at ¶¶ 9–17.

Both Plaintiffs learned of the fact that their religious exercise was suspended by a letter that was sent to Plaintiffs by Defendant Tim Kramer. Scott Aff. ¶ 16; Lewis Aff. ¶ 13; Ex. 1. This letter was not addressed to Plaintiffs individually; it was addressed to all members of the "Native American Faith Group." *Id*. The letter stated that "per repeated safety and security violations, the Native American faith group is suspended from using the Native American Religious-Use Land for 60 days (effective today, 2/26/26 until 4/27/26.)" Ex. 1. Plaintiffs themselves are not suspected to have been involved with the supposed safety and security violations. Scott Aff. ¶ 14; Lewis Aff. 12.

The letter sent by Defendant Kramer to Plaintiffs explained that Plaintiffs would be provided alternative access to the "Religious Center" where they could worship instead. Ex. 1; Scott Aff. ¶¶ 16–18; Lewis Aff. ¶¶ 13–14. Scott explained to Defendant Kramer that his faith requires participating in the sweat lodge ceremony, smudging, and smoking the ceremonial pipe for prayer, and he inquired about whether the Religious Center would accommodate these practices. Scott Aff. ¶ 19. Defendant Kramer replied to Scott that neither Scott, nor any other member of the Native American Faith Group, would be permitted to engage in sweating, smudging, or smoking in this alternative space. Scott Aff. ¶ 20. Scott explained to Defendant Kramer that these are essential components of his religious practice and that he cannot complete his religious exercise in the Religious Center. Scott Aff. ¶ 21.

Both Plaintiffs immediately initiated the administrative grievance process to grieve their loss of access to their required religious practice, yet neither Plaintiff has received redress from this process. Scott Aff. ¶ 26–27; Lewis Aff. ¶ 15. Plaintiffs were issued a pass to use the Religious Center for their religious worship despite explaining to Defendants that this space could not accommodate their religious exercise. Scott Aff. ¶ 22; Lewis Aff. ¶ 16. Lewis chose not to use the pass because he

3

understood that he would not be permitted to sweat, smudge, or smoke in the Religious Center, all of which are essential to his religious practice. Lewis Aff. ¶ 16. Scott used the pass to assess whether the Religious Center could accommodate his religious practice. Scott Aff. ¶ 22. When Scott arrived at the Religious Center, he noticed that there was incense burning and saw that it created smoke. *Id.* at ¶ 23. Scott explained to Defendant Kramer that he noticed that other faith groups can create smoke in the Religious Center as part of their religious practice. *Id.* at ¶ 24. Scott asked Defendant Kramer if he would then also be permitted to smudge or smoke the ceremonial pipe in this space as these things are very similar in nature to burning incense. *Id.* Defendant Kramer explained that "for safety and security reasons, creating smoke inside" is not permitted. *Id.* at ¶ 25.

Plaintiff Scott submitted an emergency grievance regarding the continuing denial of his access to religious exercise and NSP officials closed his emergency grievance because it was deemed to not be an emergency. *Id.* at ¶ 27. Scott has seen that members of other faith groups have continued to have access to the same area that that he is suspended from. *Id.* at ¶ 28. Today, both Plaintiffs are unable to exercise their religious beliefs because of the suspension imposed upon the entire Native American Faith Group. *Id.* at ¶ 29. Lewis Aff. ¶ 17.

<u>**STANDARD OF REVIEW**</u>

A court should enter a temporary restraining order when a plaintiff demonstrates (1) a threat of irreparable harm; (2) that the balance of equities between parties favors granting relief for the plaintiff; (3) a probability that they will succeed on the merits; and (4) that the public interest weighs in plaintiff's favor. *Schmitt v. Rebertus*, 148 F.4th 958, 966 (8th Cir. 2025) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc)); *see Tumey v. Mycroft AI, Inc.*, 27 F.4th 657 (8th Cir. 2022) (*Dataphase* factors apply to both preliminary injunctions and temporary restraining orders); *see also* Fed. R. Civ. P. 65(b)(1). The burden of establishing the propriety of the temporary restraining

order is on the movant. *Tumey*, 27 F.4th at 664 (quoting *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694 (8th Cir. 2021)).

## ARGUMENT

Plaintiffs do not ask this Court to order Defendants to create a new accommodation for their religious beliefs. Plaintiffs simply ask this Court to reinstate the access that Plaintiffs already had before Defendants suspended them.

Applying the *Dataphase* factors, Plaintiffs clearly demonstrate the necessity and propriety of emergency equitable relief. Plaintiffs will continue to experience the irreparable harm of denial of access to their religion absent immediate court intervention because Defendants have stated that the suspension will remain in effect until April 27, 2026. The balance of equities tips in favor of restoring Plaintiffs to their religious practice. Defendants can point to no evidence that restoring Plaintiffs to the position that they were in prior to the imposition of the illegal suspension would cause injury to Defendants. Free and equal access to religious exercise without arbitrary state-imposed restraint is always in the public interest. *See Schmitt*, 148 F.4th at 970.

Plaintiffs are likely to succeed on the merits of each of their claims. The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, requires Defendants to prove that Plaintiffs' suspension is the least restrictive means of furthering a compelling governmental interest. Defendants have vaguely referred to "safety and security" interests for the suspension, but suspending the religious practice of two individuals that are not suspected to have been involved with a safety and security violation does nothing to keep the prison safe or secure. The First Freedom Act, Neb. Rev. Stat. § 20-701 *et seq.*, requires that Nebraska state action burdening a Nebraskan's religious exercise is *essential to further* a compelling governmental interest and be the least restrictive means of accomplishing this. Neb. Rev. Stat. § 20-703 (emphasis added).  Suspending Plaintiffs from practicing their religion due to no fault of their own is not essential to furthering any security interest, nor is it the least restrictive means. The Free

5

Exercise Clause of the First Amendment requires Defendants' suspension to withstand strict scrutiny. But Defendants' suspension is not the least restrictive means, nor does it further Defendants' interest in safety or security. The Equal Protection Clause of the Fourteenth Amendment requires that Defendants treat Plaintiffs the same as similarly situated individuals. By applying one rule to Plaintiffs' religious practices and a different rule to other individual's religious practices, Defendants do not treat Plaintiffs the same as similarly situated individuals. The *Dataphase* factors are met and Plaintiffs will continue to experience irreparable harm absent emergency equitable relief.

**A.      Plaintiffs are Likely to Succeed on the Merits of Their Claims.**

"While no single *Dataphase* factor is determinative, the probability of success factor is the most significant." *Schmitt*, 148 F.4th at 966 (quoting *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013)). And "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Schmitt*, 148 F.4th at 971 (quoting *Minn. Citizens Concerned for Life, Inc. v. Swasnson*, 692 F.3d 864 (8th Cir. 2012)).

Plaintiffs must demonstrate that they have a "fair chance of prevailing on the merits" which means that Plaintiffs' claims "provide fair ground for litigation, but [Plaintiffs] need not show that [they have] a greater than fifty per cent likelihood of success*." Schmitt*, 148 F.4th at 966 (quoting *Sleep Number Corp. v. Young*, 33 F.4th 1012 (8th Cir. 2022)).

The Religious Land Use and Institutionalized Persons Act

RLUIPA prohibits the government from imposing a substantial burden on the religious exercise of incarcerated individuals, even when the burden results from a rule of general applicability, unless the government can make two showings: (1) imposition of the burden is in furtherance of a compelling governmental interest; and (2) imposition of the burden is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1. "Congress enacted RLUIPA

. . . 'in order to provide very broad protection for religious liberty.'" *Holt v. Hobbs*, 574 U.S. 352, 356 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)).

Plaintiffs have the initial burden of proving that a prison rule imposes a substantial burden on religious exercise that is based on sincerely held religious beliefs. *Ramirez v. Collier*, 595 U.S. 411, 425 (2022). Plaintiffs have provided evidence that their religious beliefs and practices are connected to their Indigenous heritage and include praying to the Great Spirit. Scott Aff. ¶ 3; Lewis Aff. ¶ 3. Scott has engaged in this religious practice since he was eight years old. Scott Aff. ¶ 4. Lewis has engaged in this religious practice since 2013. Lewis Aff. ¶ 4. Plaintiffs have provided evidence that the core components of their religious exercise include participation in the sweat lodge ceremony, smudging sage, cedar, and sweetgrass, and smoking red willow bark in connection with prayer. Scott Aff. ¶ 8; Lewis Aff. ¶ 8; *see Empl. Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 875 (1990) ("the 'exercise of religion' often involves not only belief and profession but the performance . . . of physical acts. . .").

Plaintiffs have regularly practiced their religion while incarcerated at NSP. Scott Aff. ¶ 7; Lewis Aff. ¶ 7. On February 26, 2026, Defendants ceased to provide Plaintiffs with access to the only space within the prison that Defendants allow Plaintiffs to engage in these core components of their religious practice. Scott Aff. ¶ 16; Lewis Aff. ¶ 13; Ex. 1. Defendants do not permit Plaintiffs to engage in core components of their religious exercise anywhere else within the facility. Scott Aff. ¶ 20. Due to Defendants' actions, Plaintiffs cannot engage in core components of their religious practice which constitutes a substantial burden on their religious exercise.

Any argument that Defendants do not substantially burden Plaintiffs' religious exercise because they have provided Plaintiffs with an alternative space to convene fails. First, under RLUIPA, the availability of alternative means of practicing religion is not a relevant consideration. *Holt*, 574 U.S. at 352–53. Second, merely convening is not how Plaintiffs practice their religion. Plaintiffs' evidence demonstrates that for them to pray to the Great Spirit, they must engage in the

essential practices of participating in sweat ceremonies, smudging, and smoking. Scott Aff. ¶ 8; Lewis Aff. ¶ 8.

Because Plaintiffs have shown that Defendants have substantially burdened their exercise of religion, the burden shifts to Defendants to show that the suspension of Scott and Lewis: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. *Holt*, 574 U.S. at 353. "Under RLUIPA, the government cannot discharge this burden by pointing to 'broadly formulated interests.'" *Ramirez*, 595 U.S. at 427 (2022) (quoting *Burwell v. Hobby Lobby Stores, Inc*, 573 U.S. 682 (2014)). "It must instead 'demonstrate that the compelling interest test is satisfied through application [of the burden] to the particular claimant. . .'" *Ramirez*, 595 U.S. at 427 (quoting *Holt*, 574 U.S. at 363). Therefore, to prevail on the RLUIPA claim, Defendants will have to prove: (1) that suspending Scott and Lewis from the only place within NSP that officials permit Plaintiffs' religious practice to occur furthers a compelling government interest; and (2) that suspending Scott and Lewis from the only place within NSP that officials permit Plaintiffs' religious practice to occur is the least restrictive means of furthering that governmental interest.

Defendants have pointed to the prison's interest in safety and security, arguing that suspending Plaintiffs from accessing the only space within NSP that Defendants allow Plaintiffs to practice their religion for sixty days somehow furthers the prison's interest in safety and security. *See* Ex. 1. While it is undoubtedly true that Defendants have an interest in maintaining a secure facility, this is the sort of "broadly formulated interest" that cannot serve as the basis for burdening Plaintiff's religious exercise. *Ramirez*, 595 U.S. at 427. Even if maintaining a secure facility was a valid governmental interest that could support Defendants' actions under RLUIPA, suspending Plaintiffs does not actually further that interest. Suspending every individual that practices the Native American faith from engaging in their religious practice does not reduce or protect against the risk of a safety and security violation occurring, it only reduces the risk of a safety and

security violation occurring in that specific space, by a specific group. A security violation can occur anywhere else; indeed, a security violation could just as easily occur within the Religious Center that Plaintiffs were directed to use instead. Therefore, imposing an arbitrarily determined sixty-day suspension of access to Plaintiffs' religious space does not further safety and security in even the broadest sense. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 547 (1993) ("a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.").

Even, assuming *arguendo*, that excluding all NAFG members from the only place they are permitted to conduct the core components of their religious practice did further Defendants' interests in safety and security, it is not the least restrictive means. Defendants' response to the discovery of contraband was to punish every individual that practices the Native American faith with a sixty-day suspension of their religious exercise. A less restrictive means of furthering safety and security at the facility would be to restrict access to whomever was responsible for the rule violation. Or install additional security measures to ensure that there cannot be contraband. *See* 42 U.S.C. § 2000cc-3(c) (RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."). For instance, the simple step of having the box of materials, which is currently accessible to any individual with access to the shared space, be maintained in a secure NSP location and checked out and checked back in by a NAFG member does not restrict religious expression; furthermore, it actually promotes the safety and security interests of Defendants by allowing the box to be inspected before and after every use, which ensures that any contraband would be seized promptly and reduce the risk of harm; any violation would also be more directly connected to the time of occurrence and allow identification of the responsible person. Defendants have imposed a substantial burden on Plaintiffs' religious exercise and the evidence before the court demonstrates that the burden does not further a compelling governmental interest, nor is it the least restrictive means. Plaintiffs are likely to prevail on their RLUIPA claim.

<u>The First Freedom Act</u>

The First Freedom Act is a Nebraska law that prohibits Nebraska state officials from substantially burdening a Nebraskan's religious exercise unless the government can prove that the burden is *essential* to furthering a compelling governmental interest while also being the least restrictive means. Neb. Rev. Stat. § 20-703 (emphasis added). The First Freedom Act authorizes a plaintiff to seek "appropriate relief" which includes preliminary equitable relief. Neb. Rev. Stat. § 20-704(3).

The First Freedom Act mirrors RLUIPA in many respects, but it goes further than RLUIPA by adding an additional step that the government must prove: that the burden is *essential* to further the compelling government interest. *Id.* (emphasis added). Defendants have imposed a substantial burden on Plaintiffs' religious exercise, Defendants' burden does not further Defendants' stated interest in security, nor is it the least restrictive means of creating a safe and secure institution. *See supra* pp. 6–9. The evidence before this Court demonstrates that suspending Plaintiffs from engaging in their religious practice is not essential to further the prison's interest in a safe facility. It is worth again noting here that Defendants set the suspension at sixty days arbitrarily. This is key for understanding whether the suspension is *essential*. If this sixty-day suspension is essential, then the evidence would have to demonstrate that it is essential on day fifty-nine, that it is essential on day sixty, and that it is no longer essential on day sixty-one. The arbitrary duration of the suspension is evidence that the suspension is not essential. Plaintiffs are likely to prevail on their claim that Defendants violate Nebraska's First Freedom Act because Defendants have substantially burdened Plaintiffs' religious exercise and the burden is not essential to furthering a compelling governmental interest, nor is it the least restrictive means.

10

<u>Free Exercise Clause of the First Amendment</u>

"At its heart, the Free Exercise Clause of the First Amendment protects the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of religious acts." *Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025) (internal quotations omitted). For a free exercise claim, the threshold issue is whether the challenged government action infringes upon a sincerely held religious belief. *Murphy v. Missouri Dept. of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004). Plaintiffs have a sincerely held religious belief that requires them to participate in the sweat lodge ceremony, smudge sage, cedar, and sweetgrass, and smoke red willow bark in connection with their prayer. Scott Aff. ¶¶ 2–4, 8–9; Lewis Aff. ¶¶ 2–4, 8. Defendants have acknowledged this, by creating the NARUL to facilitate this expression of religious belief. They infringed upon this sincerely held religious belief by restricting Plaintiffs' access to the only space within the prison that Defendants permit Plaintiffs to engage in their religious worship. Scott Aff. ¶¶ 10–29; Lewis Aff. ¶¶ 9–17; *see Love v. Reed*, 216 F.3d 682, 659–60 (8th Cir. 2000) (finding that there was a free exercise substantial burden on plaintiff when he had no way to observe his religion because of Defendants' actions).

Defendants have provided Plaintiffs with a space to gather instead, but in this space, Defendants do not permit Plaintiffs to engage in practices that are essential core components of their religious exercise. Scott Aff. ¶¶ 17–29; Lewis Aff. ¶¶ 14–17; Ex. 1. Plaintiffs cannot engage in their religious practice in this space; therefore, it is not an alternative avenue to practice their faith. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam). The federal Bureau of Prisons has stated that "the purification ceremony of the Sweat Lodge" is "a cornerstone" of Native American religious traditions. Fed. Bureau of Prisons, Dep't. of Justice, *Inmate Religious Beliefs and Practices: Native American* 14 (Mar. 27, 2002).

The United States Supreme Court has formulated "a standard of review for prisoners' constitutional claims that is responsive both to the policy of judicial

restraint regarding prisoner complaints and [to] the need to protect constitutional rights." *Turner v. Safley*, 482 U.S. 78, 85 (1987). The *Turner* Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id*. But *Turner* does not apply where the challenged prison rule is not neutral and generally applicable. *See Schmitt*, 148 F.4th at 968. State action that burdens religion is subject to strict scrutiny where the state action is not neutral and generally applicable. *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021). "And even 'subtle departures from neutrality on matters of religion' are prohibited by the Free Exercise Clause." *Schmitt*, 148 F.4th at 969 (quoting *Masterpiece Cakeshop v. Colorado Civ. Rights Comm'n*, 584 U.S. 617, 638 (2018)). Defendants' suspension does not withstand strict scrutiny because it does not further a compelling governmental interest and it is not narrowly tailored to that interest, as discussed above. Therefore, Plaintiffs are likely to prevail on their First Amendment claim.

Should *Turner* apply, the reasonableness test articulated in *Turner* is composed of four factors:

> (1) whether the policy has a valid rational connection to a legitimate governmental interest;
> (2) whether alternative means exist for the inmate to exercise the constitutional right at issue;
> (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and
> (4) whether there are ready alternatives to the policy.

*Schmitt*, 148 F.4th at 967. "The first factor operates as a threshold condition that the policy must satisfy to pass constitutional muster." *Id*. "Assuming the rule satisfies this threshold requirement, the court must determine the regulation's constitutionality by balancing the remaining three factors." *Sisney v. Kaemingk*, 15 F.4th 1181, 1190 (8th Cir. 2021). "Unless a rational connection between the regulation and the asserted interest is a matter of common sense, the prison must proffer some evidence to support the existence of such a connection." *Id*. Defendants

12

assert that suspending Plaintiffs from use of the NARUL has a connection to their interest in safety and security. *See* Ex. 1. Safety and security is undoubtedly a legitimate penological interest, but the government's objective must be a legitimate *and neutral* one. *Schmitt*, 148 F.4th at 968 (emphasis added). "A prison policy must operate in a neutral fashion, without regard to the content of the expression." *Id.* at 969 (internal quotations and alterations omitted).

Here, Defendants suspension of only those within NSP that practice the Native American faith demonstrates that the rule does not operate in a neutral fashion. Plaintiffs are not suspected of any security violation. Scott Aff. ¶ 14; Lewis Aff. ¶ 12. Individuals from other faith groups such as the Asatru, the Wiccans, and the Satanists had the same access to the space where the contraband was supposedly discovered. Individuals from these other faith groups have continued to have access to the outdoor space for their religious practice while Plaintiffs have been suspended. Because Defendants' suspension of Plaintiffs does not operate in a neutral fashion, it fails to pass the threshold factor that would allow it to withstand *Turner*. *Schmitt*, 148 F.4th at 970. When a prison rule cannot withstand the first *Turner* factor, a Court need not proceed further. *Id.*

Still, the other three *Turner* factors illustrate that Defendants' rule is not rationally connected to a legitimate penological purpose. The second factor is whether there are alternatives means available for Plaintiffs to exercise their First Amendment Free Exercise right. *Schmitt*, 148 F.4th at 967. As discussed above, Plaintiffs do not have alternative means available to them to exercise their right to practice their religion. Defendants direct Plaintiffs to the "Religious Center" which is essentially an indoor chapel. Ex. 1. Defendants told Plaintiffs that they could not participate in a sweat lodge ceremony in this space, that they could not smudge sage, cedar, and sweetgrass in this space, and that they could not smoke red willow bark in connection with prayer. Scott Aff. ¶¶ 17–29; Lewis Aff. ¶¶ 13–17. Gathering alone is not religious worship for Plaintiffs, and Plaintiffs have provided evidence that these are essential components to their religious practice. Scott Aff. ¶ 8; Lewis

Aff. ¶ 8. Plaintiffs do not have alternative means available to exercise their religious rights available to them.

For the third *Turner* factor, granting Plaintiffs the relief they seek would have little to no impact on prison resources. Plaintiffs merely ask this Court to reinstate the access that they have had for years prior to Defendants' unlawful suspension. There is no evidence that this would require any resources from Defendants. For the fourth and final *Turner* factor, there are ready alternatives to imposing a sixty-day suspension on Plaintiffs. Defendants could have imposed a suspension on those that were actually suspected of being involved. Defendants could install cameras to ensure that future safety and security violation responses are properly directed at the individuals involved. Defendants could maintain control of the box where contraband was found when it is not in use. The fourth *Turner* factor demonstrates that Defendants' actions are not rationally connected to a legitimate penological interest. Because Defendants' suspension does not withstand *Turner*, Plaintiffs are likely to succeed on the merits of their First Amendment Free Exercise claim. *See Schmitt*, 148 F.4th at 967.

Equal Protection Clause of the Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment requires that state actors treat similarly situated people alike. *Habhab v. Hon*, 536 F.3d 963, 967 (8th Cir. 2008). *Turner* does not apply to constitutional rights that are not inconsistent with proper incarceration, including the right to be treated equally under the law. *Schmitt*, 148 F.4th at 967. The first step in an equal protection case is determining whether the plaintiff has demonstrated that they are being treated differently than others who are similarly situated to them. *Klinger v. Dept. of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994).

Plaintiffs have produced evidence that demonstrates that they are being treated differently than others who they are similarly situated with. At the Religious Center, Plaintiffs are not allowed to engage in their religious practices of smudging sage, cedar, and sweetgrass and smoking red willow bark in connection

14

with prayer despite the fact that individuals from other faith backgrounds are permitted to engage in remarkably similar religious practices. Scott Aff. ¶¶ 17–29; Lewis Aff. ¶¶ 14–17. Burning incense and smudging sage, cedar, and sweetgrass are essentially the same act; Defendants permit one of these actions to occur in the Religious Center and they prohibit the other, the only difference is the faith that is associated with the action. Plaintiffs are similarly situated to other inmates that practice their faith in the religious center, yet they are treated differently.

Additionally, Scott provided evidence that he has seen that other faith groups that share the outdoor space have continued to be provided access to the outdoor space for their religious practice. Plaintiffs are similarly situated to these other individuals that have continued to have access to the outdoor space. Plaintiffs have been implicated in the supposed security violation to the same extent that members of the other faith groups have been: which is not at all. These other groups continuing to have access while Plaintiffs are suspended proves that Plaintiffs are not being treated similarly to those that they are similarly situated to. *See Love*, 216 F.3d at 691 (plaintiff's requested religious exercise posed no more of a threat to the prison than other practices that were already common in the prison).

Defendants' unlawful suspension does not withstand strict scrutiny. Government action infringing upon a fundamental right that is challenged under the Equal Protection Clause must survive scrutiny: it must be narrowly tailored to serve a compelling government interest. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). As discussed above, the arbitrary sixty-day suspension does not serve a compelling government interest because it does not actually make the prison any more safe or secure. Additionally, the sixty-day suspension is not narrowly tailored because there are ample alternative means available to Defendants to further their interest in safety and security, as discussed above. Plaintiffs are likely to succeed on the merits of their Equal Protection claim.

**B.** **Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm.**

Plaintiffs have felt the brunt of Defendant's suspension already. They have gone for over seven weeks without access to their religious practice while waiting for their administrative grievances to help. Scott Aff. ¶¶ 11, 26–27, 29; Lewis Aff. ¶¶ 10, 15, 17. Plaintiffs describe that their spirit has suffered by being denied access to their practice because they have been unable to cleanse themselves spiritually, mentally, and physically. Scott Aff. ¶ 12; Lewis Aff. ¶ 11. Scott has felt additional spiritual harm because he has been prevented from fulfilling his role as fire starter for ceremony. Scott Aff. ¶¶ 9, 12. Defendants have asserted that there is no harm to Plaintiffs because they have been provided with an alternative space where they can practice their faith. Ex. 1. But Plaintiffs have been told that in this space, they cannot engage in their core religious practices of sweating, smudging, and smoking in connection with prayer. Scott Aff. ¶¶ 16–27; Lewis Aff. ¶¶ 13–17. Defendants' letter to Plaintiffs explained that they can "meet in the Religious Center for their worship," and then Defendants prohibited each of Plaintiffs' core and essential religious practices from happening in the Religious Center. Ex. 1; Scott Aff. ¶¶ 16–27; Lewis Aff. ¶¶ 13–17. Plaintiffs cannot exercise their faith by merely gathering in a space; there are essential practices that must be completed in order to worship. Scott Aff. ¶¶ 8, 19–21, 29; Lewis Aff. ¶¶ 8, 14–17.

Plaintiffs will continue to be irreparably harmed either until Defendants decide to withdraw their unlawful suspension or until this Court can enter emergency equitable relief. Defendants have stated that this restriction on Plaintiffs' religious practices will remain in place until April 27, 2026. Ex. 1; Scott Aff. ¶ 16; Lewis Aff. ¶ 13. Therefore, Plaintiffs are not only likely to experience irreparable harm, it is guaranteed that they will continue to experience irreparable harm. They also face possible reimposition of Defendants' unlawful suspension at any moment. This is why Plaintiffs seek declaratory relief from this court. The administrative grievance process has failed to protect Plaintiffs' rights; both Plaintiffs began the administrative grievance process as soon as they learned that

their practice would be suspended and it has provided them with no relief. Scott Aff. ¶¶ 26–27; Lewis Aff. ¶15. Even when the Defendants' window to respond to Lewis's final grievance closed, Defendants extended their time with which they can respond. Lewis Aff. ¶ 15. NDCS regulations supposedly provide an emergency grievance process for incarcerated individuals that will be subjected to irreparable harm if the standard grievance time limits were used instead. 68 Neb. Admin. Code 2 § 009. Scott attempted to utilize this emergency process and Defendants responded that it is not an emergency. Scott Aff. ¶ 27.

"To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012) (internal quotation omitted). Defendants have stated clearly that the suspension of Plaintiffs' religious exercise rights will remain in place until April 27, 2026. Ex. 1; Scott Aff. ¶ 16; Lewis Aff. ¶13. Therefore, the irreparable harm that Plaintiffs have already faced is certain to continue to occur by Defendants' own statements and it is of such imminence that there is a clear and present need for relief. Scott and Lewis face certain future suppression of their religious exercise. Ex. 1; Scott Aff. ¶ 16; Lewis Aff. ¶13.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn*, 592 U.S. at 19 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Where such injury is both threatened and occurring at the time of the movant's motion, the threat of irreparable harm factor is met. *Elrod*, 427 U.S. at 374. Plaintiffs' injuries are both threatened and presently occurring. Scott Aff. ¶¶ 10–29; Lewis Aff. ¶¶ 9–17; Ex. 1.

In *Roman Catholic Diocese of Brooklyn*, the United States Supreme Court entered preliminary injunctive relief against state-imposed restriction of religious exercise during the Covid-19 pandemic where plaintiffs' religious worship was curtailed by supposedly neutral and generally applicable health regulations that prevented large gatherings. 592 U.S. at 19. The Supreme Court held that "there can

be no question" that enforcement of New York's restrictions impacting plaintiffs' religious exercise will cause irreparable harm. *Id*. The Court noted that although the plaintiffs had alternative options available to them, these alternatives did not permit the worshippers to fully engage in their required practice. *Id*. ("Catholics who watch a Mass at home cannot receive communion, and there are important religious traditions in the Orthodox Jewish faith that require personal attendance.").

*Roman Catholic Diocese of Brooklyn* illustrates that where a plaintiff's religious exercise is curtailed, even when the curtailment is temporary and supposedly furthering a compelling governmental interest, plaintiffs experience irreparable harm requiring preliminary injunctive relief. Here, Scott and Lewis can no longer engage in core components of their religious worship, sweating, smudging, and smoking, just as plaintiffs in *Roman Catholic Diocese of Brooklyn* could not engage in communion. *Id*. Plaintiffs have suffered and will continue to suffer irreparable harm if this Court does not enter emergency relief.

## C. The Balance of Equities Tips in Favor of Restoring Plaintiffs' Access to Religious Practice Pending Adjudication of the Lawfulness of Defendants' Actions.

Defendants will not experience harm if this Court issues the emergency relief sought by Plaintiffs. Plaintiffs merely ask this Court to return the parties to the place that they were in prior to Defendants' unlawful suspension. The primary function of preliminary equitable relief is to preserve the status quo until the court can hear the merits and grant full effective relief. *Cigna Corporation v. Baker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (citing *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589 (8th Cir. 1984)). The status quo is that both Plaintiffs regularly and consistently practice their faith; both Plaintiffs have participated in sweat lodge ceremony regularly while incarcerated at NSP. Scott Aff. ¶ 7; Lewis Aff. ¶ 7. Defendants are not harmed by returning to the status quo that has been the status quo for years. Conversely, Plaintiffs are harmed if Defendants' suspension is permitted to remain in place.

**D.      Religious Exercise Free from State Burden is in the Public Interest.**

"[I]t is always in the public interest to protect constitutional rights." *Schmitt*, 148 F.4th at 970 (quoting *Rodgers v. Bryant*, 942 F.3d 451 (8th Cir. 2019)). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Schmitt*, 148 F.4th at 971 (internal quotation omitted). It is undoubtedly true that Defendants have an interest in the safe administration of the prison. But members of the public also have an interest in their state officials administering a state prison in compliance with the commands of the United States Constitution and State and Federal statutes.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs respectfully request that their Emergency Motion for Temporary Restraining Order be granted.

Tremayne Scott and Joshua Lewis, Plaintiffs.

/s/ Carter T. Matt
Carter T. Matt, #28169
Grant L. Friedman, #27862
Jennifer M. Houlden, #23611
ACLU of Nebraska Foundation
134 S. 13th St., Ste. #1010
Lincoln, NE 68508
cmatt@aclunebraska.org
(402) 476-8091

/s/ Danelle Smith
Danelle Smith, #22717
Andrea Snowball, #27097
Big Fire Law & Policy Group LLP
272 Ho-Chunk Plaza, Ste. A
Winnebago, NE 68071
dsmith@bigfirelaw.com
(402) 307-9905

Attorneys for Plaintiffs

## CERTIFICATE OF COMPLIANCE

I certify that this Brief complies with the requirements of 7.1(d)(1) of NECivR.2025. This Brief contains 6542 words according to Microsoft Word, Version 2603, which was utilized to write this Brief. The word counting function was applied to include all text, including the caption, headings, footnotes, and quotations.

*/s/ Carter T. Matt*
Attorney for Plaintiffs