**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **TREMAYNE SCOTT** and **JOSHUA LEWIS**,<br><br>Plaintiffs,<br><br>v.<br><br>**ROB JEFFREYS**, in their official capacity as the Director of the Nebraska Department of Correctional Services; **BARBARA LEWIEN**, in their official capacity as the Warden of Nebraska State Penitentiary; **JASON HURT**, in their official capacity as the Associate Warden of Nebraska State Penitentiary; and **TIM KRAMER**, in their official capacity as the Religious Coordinator of Nebraska State Penitentiary,<br><br>Defendants. | Case No. 4:26-cv-3124<br><br>**AMENDED COMPLAINT**<br><br>**EMERGENCY COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUCTIVE RELIEF, PERMANENT INJUNCTIVE RELIEF, AND DECLARATORY JUDGMENT** |

COMES NOW Plaintiffs Tremayne Scott and Joshua Lewis, and for their Emergency Complaint against the Director of the Nebraska Department of Correctional Services, Rob Jeffreys, the Warden of Nebraska State Penitentiary, Barbara Lewien, the Associate Warden of Nebraska State Penitentiary, Jason Hurt, and the Religious Coordinator of Nebraska State Penitentiary, Tim Kramer, all in their official capacities, state and allege as follows:

## INTRODUCTION

1. Defendants are prison officials that have suspended the religious exercise of roughly sixty Native American inmates, including Plaintiffs, in response to a rule violation. Plaintiffs themselves have not been accused of any sort of violation, yet their religious practice has been suspended. Plaintiffs require the intervention of this Court to protect their right to practice their faith and to prevent its future unlawful restriction.

2. Plaintiffs Tremayne Scott ("Scott") and Joshua Lewis ("Lewis") are Native American Nebraskans. Scott is an enrolled member of the Rosebud Sioux Tribe. Lewis is of Cherokee and Tarascan descent. Plaintiffs practice the traditional religious exercise of their respective tribes. Scott and Lewis are incarcerated at Nebraska State Penitentiary ("NSP"), a prison facility with the Nebraska Department of Correctional Services ("NDCS") in Lincoln, Nebraska.

3. Plaintiffs have regularly, indeed, weekly, practiced their religion while incarcerated at NSP until NSP issued a total suspension of all religious practice for all Native Americans incarcerated at the facility on February 26, 2026. This suspension remains in effect.

4. Nebraska prison officials are violating the United States Constitution (Free Exercise and Equal Protection), Federal statute (the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §2000cc *et seq.*), and Nebraska statute (the First Freedom Act, Neb. Rev. Stat. § 20-701 *et seq.*).

5. Plaintiffs pray that this Court enters emergency equitable relief against Defendants that requires Defendants to immediately reinstate Plaintiffs' access to religious exercise. Plaintiffs also pray for permanent equitable relief that would prevent Defendants from imposing future suspensions of Native American religious exercise.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the federal law claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) as the claim arises from the same facts and is so related to the federal claims that the exercise of supplemental jurisdiction is proper.

7. Venue in the District of Nebraska is proper under 28 U.S.C. § 1391 as a substantial part of the events giving rise to these claims occurred in this judicial district and all Defendants reside in Nebraska.

## PARTIES

8. Plaintiff Tremayne Scott is a Native American Nebraskan: he is an enrolled member of the Rosebud Sioux Tribe. As part of his Indigenous heritage and religious beliefs, Scott prays to the Great Spirit and takes part in traditional ceremonies. These practices include the sweat lodge ceremony, smudging with sage, cedar, and sweetgrass, and smoking red willow bark. Scott has practiced these religious traditions since he was eight years old and he regularly participates in these ceremonies and prayers. Scott is incarcerated at NSP in Lincoln, Nebraska.

9. Plaintiff Joshua Lewis is a Native American Nebraskan: he is of Cherokee and Tarascan descent. As part of his Indigenous heritage, his religious beliefs include praying to the Great Spirit. In accordance with these beliefs, he participates in the sweat lodge ceremony, including the practices of smudging with sage, cedar, and sweetgrass, and smoking red willow bark. Lewis has practiced his faith this way since 2013. Lewis is incarcerated at NSP in Lincoln, Nebraska.

10. Plaintiff Scott and Plaintiff Lewis are collectively referred to as Plaintiffs.

11. Defendant Rob Jeffreys is the Director of NDCS. He is statutorily charged with overseeing the administration and management of NDCS facilities. Neb. Rev. Stat. § 83-173. NSP is among the several NDCS facilities that Defendant Jeffreys oversees. Defendant Jeffreys has statutory responsibility over all NDCS actions and policies. Defendant Jeffreys is sued in his official capacity.

12. Defendant Barbara Lewien is the Warden of NSP. As the Warden of NSP, Defendant Lewien is responsible for the daily operation of the facility. Neb. Rev. Stat. § 83-177. Defendant Lewien is responsible for the decision to suspend Plaintiffs' religious exercise. Defendant Lewien is sued in her official capacity.

13. Defendant Jason Hurt is the Associate Warden of NSP. Defendant Hurt has a supervisory and oversight role at NSP and he is responsible for the decision to suspend Plaintiffs' religious exercise. Defendant Hurt is sued in his official capacity.

14. Defendant Tim Kramer is the Religious Coordinator at NSP. Defendant Kramer oversees the various religious programs at NSP, and he is responsible for the decision to suspend Plaintiff's religious exercise. Defendant Kramer is sued in his official capacity.

## FACTS

Plaintiffs and their Religious Beliefs

15. Plaintiffs Tremayne Scott and Joshua Lewis are incarcerated at NSP.

16. NSP is a correctional facility within the NDCS system, and it is a recognized penal institution that receives Federal financial assistance.

17. Scott is a Lakota man and an enrolled member of the Rosebud Sioux Tribe.

18. Traditional Lakota religious practice includes praying to the Great Spirit through the sweat lodge ceremony.

19. The sweat lodge ceremony is conducted in a lodge constructed from saplings and wooden poles and covered with blankets, tarps, or hides, and involves the preparation of a fire to heat stones, the pouring of water over those stones to

create steam, and participation in prayer within the darkened, enclosed lodge. The ceremony also includes smudging with sage, cedar, and sweetgrass and the smoking of red willow bark through a ceremonial pipe. Sacred items such as eagle feathers and hand drums are used during the sweat lodge ceremony. These practices are necessary to cleanse the mind, body, and spirit in preparation for prayer, and are integral components to the prayer and sweat lodge ceremony and cannot be omitted without substantially deteriorating its religious significance.

20. Scott's sincerely held religious beliefs require that he engage in prayer to the Great Spirit through the sweat lodge ceremony, a long-held Lakota religious practice.

21. Scott's religious practice involves sweat lodge ceremonies, smudging sage, sweetgrass, and cedar and smoking red willow bark through a ceremonial pipe to engage in prayer. Scott has practiced his faith this way since he was eight years old.

22. Lewis is of Cherokee and Tarascan descent.

23. Traditional Cherokee and Tarascan practice includes praying to the Great Spirit.

24. Lewis's sincerely held religious practice involves prayer through sweat lodge ceremonies. Lewis has practiced his faith this way since 2013.

<u>The "Native American Faith Group" and "Native American Religious-Use Land"</u>

25. Any incarcerated individual that follows traditional Native American religion can only engage in the core religious practices of prayer through the sweat lodge ceremony, a practice common to many Native American tribes, if they indicate to NSP that they require access to items for smudging and smoking and access to a sweat lodge for the sweat lodge ceremony.

26. An incarcerated individual that makes this indication to NSP officials is then placed in the Native American Faith Group ("NAFG"). NAFG is not a "group" in the conventional sense: it does not have formal leadership, nor any internal organization. The NAFG is simply a convenient way for NSP to categorize incarcerated individuals that have indicated that they require access to Native American religious materials for their religious practice. Roughly sixty inmates are included in the NAFG.

27. Both Plaintiffs made this indication to NSP staff shortly after arriving at NSP, and as such they are both members of the NAFG.

28. Plaintiffs, indeed, all members of the NAFG, are not provided with all of the items that they require to conduct their religious practice. Instead, Plaintiffs are provided with what is supposed to be regularly scheduled access to a singular

plot of outdoor space within the NSP prison yard where those items remain. This one space in the facility is roughly 50 feet by 50 feet, and it is referred to by the facility as the Native American Religious-Use Land ("NARUL"). The NARUL contains a sweat lodge structure that remains in place throughout the year which the group uses for sweat ceremonies.

29. The NARUL is the only place in the facility that incarcerated individuals are allowed to smudge, smoke, or engage in sweat lodge ceremonies. Smudging is the practice of cleansing oneself using the smoke of burned sage, cedar, or sweetgrass—medicinal herbs sacred to many Native American tribes—while engaging in prayer to the Great Spirit. Typically, tobacco is smoked through a ceremonial pipe to carry prayers to the Great Spirit; however in this restricted setting, red willow bark is used. A sweat lodge is a structure designed to symbolize the womb of Mother Earth; participation involves bringing heated rocks inside, pouring water over the rocks to create steam, singing ceremonial songs, and engaging in prayer. Smudging, smoking, and participation in sweat lodge ceremonies are indispensable practices for prayer to the Great Spirit.

<u>The "Passes" and the "Shared Outdoor Space"</u>

30. Inmates cannot access the NARUL whenever they would like. It is only accessible with a "pass." The NARUL is a subset of space contained within a larger and separate fenced off portion of the prison yard. For the purposes of this litigation, Plaintiffs refer to this larger fenced off portion of the prison yard that contains the NARUL as "the shared outdoor space."

31. A pass works like a school hall-pass. It is issued by prison officials, and it allows an inmate to travel to an otherwise restricted area by showing the guards that they have authorized access per the pass. Inmates cannot request a pass for access to the NARUL at any time they would like, rather Defendants dictate when and how the passes are provided.

32. Plaintiffs get one pass to the NARUL per week: it is either on Saturday morning or on Sunday morning, depending on that individual's housing unit.

33. The shared outdoor space contains more than just the NARUL. In addition to the dedicated space for Native American religious practice, other faith groups that require tools and space for their religious practices have their own dedicated spaces within the shared outdoor space. These groups include the Wicca, the Asatru, and the Satanists. These other religious groups also require fire for their religious practices. NSP provides stock for a shared woodpile within the shared outdoor space that all religious groups utilize. In addition to the dedicated

space for inmates with other religious beliefs, there is a minimum-security housing unit that has daily access to the shared outdoor space.

34. The shared outdoor space is only accessible with a pass. Incarcerated individuals need a pass to enter the shared outdoor space, but a pass is not required to move between the dedicated spaces for each group and there is no physical separation of these spaces, only nominal distinction.

35. Prior to their suspension, Plaintiffs were provided one pass per week to access the NARUL since initially indicating that they require access to practice their religion. This access was typically for Sunday mornings. This access had continued consistently, though it would occasionally be interrupted by unforeseeable neutral events such as state-wide burn-bans that forbid fires.

36. Plaintiff Scott has recently served as a fire starter for Sunday sweat ceremonies. Scott served as a primary facilitator for sweat ceremonies and Scott's pass would permit him to go to the NARUL earlier than other group members to begin preparations for the ceremony.

37. Next to the woodpile that all faith groups share for their burnings, there is a box where NSP requires Native American inmates to store the items that are essential to conducting Native American religious practice, including a ceremonial pipe for smoking red willow bark, hand drums, eagle feathers, a water pail and ladle, red willow bark, sage, cedar, and sweetgrass. This box is not secured by a lock and although it is primarily used for storing the NAFG necessary items, it is accessible to any incarcerated individual that has access to the shared outdoor space, which includes: members of the Wiccan, Asatru, Satanic faith groups, and incarcerated individuals that are housed within the minimum-security housing unit that is connected to the shared outdoor space. All these groups have regular access to this shared space.

<u>Suspension of Native American Faith Group</u>

38. On February 22, 2026, Scott and Lewis did not receive passes to go to the NARUL for their scheduled religious exercise.

39. A state-wide burn-ban had been in effect for the preceding week, and Scott was unsure whether the lack of a pass was connected to the ongoing burn-ban or whether it was related to something else.

40. Upon verbally inquiring about the reason that Scott did not receive a pass to go to the NARUL with NSP's Religious Coordinator, Defendant Kramer, Scott learned that all members of NAFG, that is, *every individual at NSP that practices the Native American faith*, was suspended from accessing the NARUL for their religious practice.

41. Kramer told Scott that NSP staff discovered contraband in the box that contains materials used for Native American religious practices. Kramer did not tell Scott that he was personally suspected of being involved. Scott pressed for further information about why NSP has restricted his religious practice in connection with a rule violation that he is not suspected of having committed, but he was unsuccessful. Scott pressed for further explanation about the fact that other groups have unsecured access to the location where the contraband was supposedly discovered, but he was unsuccessful.

42. On February 26, 2026, Defendant Kramer sent a letter to all members of NAFG stating that "per repeated safety and security violations, the Native American faith group is suspended from using the Native American Religious-Use Land for 60 days (effective today, 2/26/26 until 4/27/26.)" The letter went on to explain that Native American Faith Group members will alternatively be allowed to meet in the Religious Center at specified times. The letter was addressed to every NAFG member generally and it did not indicate that either Plaintiff was thought to be involved with the "safety and security violations." The letter is attached to this complaint as Exhibit 1.

43. Upon receiving this letter, both Plaintiffs immediately initiated the administrative grievance process, and both Plaintiffs remain without redress from this process.

44. When this lawsuit was initially filed on April 13, 2026, neither Plaintiff had received a response to their step-two grievance; step-two is the final step of the administrative grievance process. At the time of the filing of Plaintiffs' Amended Complaint, both Plaintiffs have now received a response to their step-two grievance, dated April 14, 2026, and both Plaintiffs remain suspended from their practice.

45. Step-one of the administrative grievance process requires review by NSP's Warden, Defendant Lewien, or her designee, and this process afforded relief to neither Plaintiff. 68 Neb. Admin. Code 2 § 006.

46. NDCS regulations provide that the Director of NDCS, Defendant Jeffreys, or his designee, has 20 working days to respond to a step-two grievance. 68 Neb. Admin. Code 2 § 007. On April 2, 2026, at the end of Plaintiff Lewis's 20-working day window, Lewis received a 10-day extension of NDCS's response time. NDCS regulations provide that "circumstances such as illness, injury, or unavailability of a witness may lengthen the response time," 68 Neb. Admin. Code 2 § 003.07, but no such circumstance had been identified to Lewis.

47. On March 17, 2026, Plaintiff Scott filed an emergency grievance pursuant to 68 Neb. Admin. Code 2 § 009. Given the fact that he had been

suspended from accessing the NARUL for multiple consecutive weeks and it appeared that he would continue to be unable to exercise his religion due to someone else's rule violation, Scott considered this irreparable harm, which the emergency grievance process supposedly provides for. 68 Neb. Admin. Code 2 § 009.

48. NDCS responded to Scott that this was not an emergency and closed his grievance.

NAFG is the Only Group Penalized and Prohibited from Practicing Their Religion

49. All other groups that utilize the shared outdoor space for their religious practice, including the Wiccans, the Asatru, and the Satanists, have continued to have access to the shared outdoor space for their religious practice. Any member of any of these groups had the same access to the box where the contraband is claimed to have been discovered.

50. Plaintiffs learned from Defendant Kramer that in the alternative space that they have been told to use instead, they would not be permitted to conduct a sweat lodge ceremony, they would not be permitted to smudge sage, cedar, or sweetgrass, and they would not be permitted to smoke red willow bark that is required for their prayer. Plaintiffs explained to Defendant Kramer that these are core components to their religious exercise and that they cannot complete their practice in this alternative space.

51. Lewis, along with the vast majority of members of NAFG, declined to utilize the pass that he was issued for this alternative space because he had been told by Defendant Kramer that he would not be permitted to sweat, smudge, or smoke in this space which are essential components of his religious practice. Because Lewis did not use the pass for either of the first two times it was issued to him, he is no longer issued a pass per NSP policy.

52. Scott decided to utilize the pass to determine whether this alternative space could support his religious exercise. When he arrived, he noticed that other Christian faith groups use this space for their religious practice. Scott saw that these groups burned incense in this space and inquired with Defendant Kramer about whether he could similarly smudge or smoke red willow bark in this space for his religious practice, and Defendant Kramer told him that he could not.

## LEGAL FRAMEWORK

The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq.*

53. The Religious Land Use and Institutionalized Persons Act ("RLUIPA") establishes a "statutory free exercise claim encompassing a **higher standard of**

**review than what applies to constitutional free exercise claims**." *Murphy v. Missouri Dep't Corr.*, 372 F.3d 979, 987 (8th Cir. 2004) (emphasis added).

54. RLUIPA specifically protects incarcerated individuals from state-imposition of undue burdens on religious exercise, providing that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

55. "Government" means "a State, county, municipality, or other governmental entity created under the authority of a State . . ." and includes "any branch, department, agency, or instrumentality, or official of an entity" listed above. 42 U.S.C. § 2000cc-5(4).

56. "Program or activity" means "all of the operations of any [department, agency, special purpose district, or other instrumentality of a State] . . . any part of which is extended Federal financial assistance." 42 U.S.C. § 2000cc-1(b).

57. RLUIPA applies "in any case in which—(1) the substantial burden is imposed in a program or activity that receives Federal financial assistance . . . ." 42 U.S.C. § 2000cc-1(b).

58. The United States Supreme Court has explained that "[s]everal provisions of RLUIPA underscore its expansive protection for religious liberty," including a capacious definition of "religious exercise," a mandate that RLUIPA "shall be construed in favor of a broad protection of religious exercise . . . ", and the fact that Congress stated that RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (citing 42 U.S.C. § 2000cc *et seq.*).

59. "RLUIPA explicitly provides for a cause of action to enforce the heightened free exercise right it creates." *Van Wyhe v. Reisch*, 581 F.3d 639, 649 (8th Cir. 2009).

60. An incarcerated person establishes a prima facie RLUIPA claim "by showing that [a] government practice substantially burdens the person's exercise of religion . . . " *Id.* (citing 42 U.S.C. § 2000cc-2(b)). "[T]hen, the government bears the burden of persuasion on every other element of the claim." *Id.* (citing 42 U.S.C. § 2000cc-2(b)).

61. RLUIPA provides that a plaintiff may obtain "appropriate relief" which includes equitable relief. 42 U.S.C. § 2000cc-2(a); *See Sossamon v. Lone Star State*

*of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) ("RLUIPA unambiguously creates a private right of action of injunctive and declaratory relief.").

62. "Access to bona fide religious exercise is not a privilege to be dangled as an incentive to improve inmate conduct, and placing such religious exercise in the category of privilege to be earned is fundamentally inconsistent with the right to religious exercise that RLUIPA guarantees to prisoners." *Greenhill v. Clarke*, 944 F.3d 243, 250 (4th Cir. 2019).

First Freedom Act, Neb. Rev. Stat. § 20-701 *et seq.*

63. The First Freedom Act protects Nebraskans from state-imposed burden of religious exercise, providing that:

> [S]tate action shall not . . . substantially burden a person's right to the exercise of religion unless it is demonstrated that applying the burden to that person's exercise of religion in this particular instance is **essential** to further a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest . . .

Neb. Rev. Stat. § 20-703(1) (emphasis added).

64. The First Freedom Act's purpose is to provide individuals with a remedy for state-imposed religious burden that has already occurred as well as state-imposed religious burden that is likely or guaranteed to come. The act authorizes a person to obtain "appropriate relief, including against the state," which includes: (a) actual damages; (b) preliminary and other equitable or declaratory relief; and (c) attorney's fees and litigation costs. Neb. Rev. Stat. § 20-704(3).

65. The First Freedom Act markedly mirrors language used in RLUIPA, forbidding "substantial[] burden[s]" on "exercise of religion," requiring a "compelling governmental interest" and the "least restrictive means." *Compare* Neb. Rev. Stat. § 20-703(1) *with* 42 U.S.C. § 2000cc-1.

66. Going further than RLUIPA does to protect religious exercise, the First Freedom Act requires the government to prove that the burden is *essential* to furthering a compelling governmental interest. *See* Neb. Rev. Stat. § 20-703(1) (emphasis added); 42 U.S.C. § 2000cc-1.

67. State action includes the imposition of rules by NDCS. Neb. Rev. Stat. § 20-702(5) ("State action means the implementation or application of any law, including . . . rules . . . and policies, whether statutory or otherwise, or other action by the state . . . .")

68. Any action that "constrains, inhibits, curtails, or denies" religious exercise constitutes state action for the purposes of the First Freedom Act. Neb. Rev. Stat. § 20-702(6)(a)

69. The First Freedom Act provides a cause of action for any person whose exercise of religion has been burdened or restricted, or is likely to be burdened or restricted, in violation of the act. Neb. Rev. Stat. § 20-704(1).

Free Exercise Clause of the First Amendment

70. "At its heart, the Free Exercise Clause of the First Amendment protects the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of religious acts." *Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025) (internal quotations omitted).

71. For a free-exercise claim, the threshold issue is whether the challenged government action infringes upon a sincerely held religious belief. *Murphy*, 372 F.3d at 983.

72. State action is subject to strict scrutiny under the Free Exercise Clause where the state action is not neutral and generally applicable. *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021).

*73.* "And even 'subtle departures from neutrality on matters of religion' are prohibited by the Free Exercise Clause." *Schmitt v. Rebertus*, 148 F.4th 958, 969 (8th Cir. 2025) (quoting *Masterpiece Cakeshop v. Colorado Civ. Rights Comm'n*, 584 U.S. 617, 638 (2018)).

74. Federal courts provide incarcerated individuals with a forum to protect free exercise rights guaranteed by the First Amendment. *Hamilton v. Schriro*, 74 F.3d 1545, 1550 (8th Cir. 1996).

75. Prison inmates "do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).

76. State action "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. at 534.

77. "Neutrality and general applicability are interrelated . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 531 (1993).

78. "Several factors are to be considered when evaluating the reasonableness of a prison regulation: (1) whether there is a valid, rational connection between the regulation and the asserted governmental interest; (2) whether alternative means for exercising the right remain open to the prisoner; (3)

the impact of the regulation on prison staff, other inmates, and the allocation of prison resources; and (4) the availability of ready alternatives to the regulation." *Hamilton*, 74 F.3d at 1551 (citing *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

79. "The first *Turner* factor, however, requires more than a legitimate penological interest. 'The governmental interest must be a legitimate *and* neutral one.'" *Schmitt*, 148 F.4th at 969 (quoting *Turner*, 482 U.S. at 90) (emphasis added).

Equal Protection Clause of the Fourteenth Amendment

80. The Equal Protection Clause of the Fourteenth Amendment requires that state actors treat similarly situated people alike. *Habhab v. Hon*, 536 F.3d 963, 967 (8th Cir. 2008).

81. Government action infringing upon a fundamental right that is challenged under the Equal Protection Clause must survive scrutiny: it must be narrowly tailored to serve a compelling government interest. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

82. The first step in an equal protection case is determining whether the plaintiff has demonstrated that they are being treated differently than others who are similarly situated to them. *Klinger v. Dep't of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994).

83. "The similarly situated inquiry focuses on whether the plaintiffs are similarly situated to another group for purposes of the challenged government action." *Id*.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq.*

84. Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

85. RLUIPA provides Plaintiffs with a private cause of action against Defendants to obtain appropriate relief. 42 U.S.C. § 2000cc-2(a).

86. Plaintiffs' sincerely held religious beliefs direct their religious exercise and require that they regularly engage in the core components of their faith: sweat lodge ceremonies, smudging sage, cedar, and sweetgrass, and smoking red willow bark in connection with prayer. *See* 42 U.S.C. § 2000cc-5(7)(A).

87. Defendants have suspended Plaintiffs from accessing the NARUL—the only space in the facility that Defendants allow Plaintiffs to practice their religious

beliefs—for an arbitrary period of time for reasons that, by Defendants' admissions, are disconnected from the actions of either Plaintiff.

88. Defendants have imposed a substantial burden on Plaintiffs' religious exercise in violation of RLUIPA by prohibiting Plaintiffs from practicing essential elements of their religious faith. 42 U.S.C. § 2000cc-1(a).

89. Defendants' imposition of this burden on Plaintiffs does not further a compelling governmental interest because the suspension does not actually address any supposed security interest, nor is it specifically tied to the actions of any member of NAFG, let alone either Plaintiff. 42 U.S.C. §§ 2000cc-1(a)(1).

90. A total ban of Native American religious exercise for all individuals incarcerated at NSP is not least restrictive to any compelling governmental interest; there is no compelling governmental interest in prohibiting religious practice. 42 U.S.C. §§ 2000cc-1(a)(2).

**SECOND CAUSE OF ACTION**

**Violation of the First Freedom Act, Neb. Rev. Stat. §§ 20-701 *et seq.***

91. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

92. Nebraska's First Freedom Act provides Plaintiffs with this cause of action against Defendants and authorizes Plaintiffs to obtain appropriate relief against Defendants, which includes "preliminary and other equitable or declaratory relief as may be appropriate. . ." Neb. Rev. Stat. § 20-704.

93. The First Freedom Act provides that appropriate relief includes attorney's fees and other litigation costs as reasonably incurred. Neb. Rev. Stat. § 20-704(3)(c).

94. Plaintiffs' sincerely held religious beliefs motivate and require them to regularly participate in the core components of their faith: sweat lodge ceremonies, smudging with sage, cedar, and sweetgrass, and smoking red willow bark in connection with prayer; this is the exercise of their religion. *See* Neb. Rev. Stat. § 20-702(1) (defining "exercise of religion").

95. Defendants' implementation of an arbitrary suspension of Plaintiffs' religious exercise constitutes state action. Neb. Rev. Stat. § 20-702(5).

96. Defendants' total restriction of access to the only space in all of NSP where Defendants permit Native American religious practices to occur directly prevents Plaintiffs from exercising their religion. Defendants' actions clearly "constrain, inhibit, curtail, and deny" Plaintiffs the exercise of their religion and constitute a substantial burden. Neb. Rev. Stat. § 20-702(6)(a).

97. Defendants' total restriction of Plaintiffs' ability to practice their religion is a violation of the First Freedom Act. Neb. Rev. Stat. § 20-703(1).

98. Defendants' suspension of Plaintiffs' religious exercise is clearly not *essential* to furthering a compelling governmental interest, nor is it the least restrictive means. There are countless other ways that Defendants can promote objectives of safety and security that do not involve an arbitrary, punitive suspension that applies to everyone in the facility whether or not they are suspected of being involved with any rule violation. Neb. Rev. Stat. § 20-703(1).

**THIRD CAUSE OF ACTION**

**Violation of the Free Exercise Clause of the First Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983**

99. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

100. 42 U.S.C. § 1983 provides a cause of action for every person that is deprived of a constitutional right by state action.

101. 42 U.S.C. § 1983 authorizes Plaintiffs to receive equitable relief to redress constitutional violations.

102. Defendants infringe upon Plaintiffs' sincerely held religious beliefs by arbitrarily suspending their religious exercise in violation of Free Exercise Clause of the First Amendment to the United States Constitution. U.S. Const. amend. I.; *see Murphy*, 372 F.3d at 983.

103. Defendants' infringement upon Plaintiffs' sincerely held religious beliefs is not neutrally or generally applied and it cannot withstand strict scrutiny. *See Fulton,* 593 U.S. at 533; *Schmitt*, 148 F.4th at 969.

104. Suspending all Native Americans at NSP that engage in a particular religious practice from exercising their religious beliefs for an arbitrary period of time is not a compelling governmental interest.

105. Suspending all Native Americans at NSP from exercising their religious beliefs is not the least restrictive means of furthering any potential interest that Defendants have in safety and security because the imposition of this burden has no impact on whether the shared outdoor space is safe or secure.

**FOURTH CAUSE OF ACTION**

**Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983**

106. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

107. 42 U.S.C. § 1983 provides a cause of action for every person that is deprived of a constitutional right by state action.

108. 42 U.S.C. § 1983 authorizes Plaintiffs to receive equitable relief to redress constitutional violations.

109. Plaintiffs are similarly situated to NSP inmates within the other faith groups that share the outdoor space, such as the Asatru, the Wiccans, and the Satanists. All of these religious groups share the same space and have the same access to the NARUL land that Plaintiffs had. Individuals in these other faith groups have continued to have regular access to the religious-use land while Plaintiffs have been suspended. Plaintiffs are similarly situated to other inmates within NSP that have continued to have access to their religious practice while Plaintiffs have been suspended in violation of the Equal Protection Clause.

110. Plaintiffs have been told that they can practice their religion within the Religious Center instead. Plaintiffs have explained that the core components of their religious exercise requires smudging sage, cedar, and sweetgrass, and smoking red willow bark. NSP officials have told Plaintiffs that they cannot engage in these practices inside the Religious Center because it is a safety violation to create smoke inside. Other NSP inmates that practice other religions are permitted to engage in their own religious practices that create smoke within the Religious Center, such as the Christian inmates that are permitted to burn incense. Plaintiffs are similarly situated to other inmates that can engage in their religious practices inside the Religious Center, but Plaintiffs are being treated differently than those that are similarly situated in violation of the Equal Protection Clause.

111. Defendants violate the Equal Protection Clause by treating Plaintiffs differently than incarcerated individuals with other beliefs that are similarly situated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

a. Assume jurisdiction over the matter;

b. Issue a temporary restraining order prohibiting Defendants from restricting Plaintiffs' access to their religious exercise and practice;

c. Issue a preliminary injunction prohibiting Defendants from restricting Plaintiffs' access to their religious exercise and practice;

d. Issue a permanent injunction prohibiting Defendants from restricting Plaintiffs' access to their religious exercise and practice;

e. Issue a declaratory judgment that Defendants violate the Religious Land Use and Institutionalized Persons Act, the First Freedom Act, the Free Exercise Clause of the First Amendment to the United States Constitution, and the

Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by restricting access to Plaintiffs' religious exercise and practice;

f. Award Plaintiffs attorneys' fees and costs; and

g. Grant any other and further relief that this Court deems just and proper.

Dated April 15, 2026

Respectfully submitted,

Tremayne Scott and Joshua Lewis, Plaintiffs.

/s/ Carter T. Matt
Carter T. Matt, #28169
Grant L. Friedman. #27862
Jennifer M. Houlden, #23611
ACLU of Nebraska Foundation
134 S. 13th St., Ste. #1010
Lincoln, NE 68508
cmatt@aclunebraska.org
(402) 476-8091

/s/ Danelle Smith
Danelle Smith, #22717
Andrea Snowball, #27097
Big Fire Law & Policy Group LLP
272 Ho-Chunk Plaza, Ste. A
Winnebago, NE 68071
dsmith@bigfirelaw.com
(402) 307-9905

Attorneys for Plaintiffs